TOBER v. PERE MARQUETTE RAILROAD CO.

1. MASTER AND SERVANT—SECTION HAND—NEGLIGENCE—EVIDENCE —SUFFICIENCY.

In an action under the Federal liability act (35 U. S. Stat. 65, chap. 149) against a railroad company by one of its section hands, who was injured by a switch engine while clearing snow from the track at night during a snow storm, where the testimony of the parties was in conflict as to the speed at which the engine ran, the distance plaintiff was thrown by it, whether it was properly lighted or not, and whether signals of its approach were given by bell or whistle, it cannot be said, as a matter of law, that there was no testimony to submit to the jury on the question of defendant's negligence under the indicated abnormal weather conditions prevailing at the time.

On constitutionality, application and effect of Federal Employers' Liability Act generally, see comprehensive notes in 47 L. R. A. (N. S.) 38; 48 L. R. A. (N. S.) 987; L. R. A. 1915C, 47.

210—Mich.—9.

2. SAME—DUTY OF EMPLOYEE TO KEEP LOOKOUT.

> Defendant's negligence could only be predicated upon neglect of some secondary duty it owed plaintiff, upon whom primarily rested the duty of self-preservation in the line of his employment by keeping a lookout for and avoiding moving trains, and his duty in that respect could not be measured by that imposed upon passengers or travelers on highways.

3. SAME—TRIAL—INSTRUCTIONS.

> *Held*, that the court did not fairly instruct the jury as to plaintiff's responsibility in keeping a lookout and avoiding danger, and placed a heavier burden upon defendant than the law imposes.

4. SAME — FEDERAL LIABILITY ACT — COMPARATIVE NEGLIGENCE — TRIAL—INSTRUCTIONS.

> Under the Federal law, the rule of comparative negligence was involved, and the failure of the court to fairly advise the jury of the comparative responsibility of the parties, which was probably reflected in the verdict for plaintiff of $6,000, *held*, reversible error.

5. SAME—CROSSING SIGNALS—NO DUTY TO EMPLOYEES.

> The trial court properly instructed the jury that a failure to give the statutory crossing signals, which were for the protection of the public and not the company's employees, would not, in itself, entitle plaintiff to recover.

6. TRIAL—SPECIAL QUESTIONS — DUTY OF JURY TO ANSWER — INSTRUCTIONS.

> Instructions by the trial court that if the jury were not unanimous in their finding on special questions, they might indicate the number voting "yes" and the number voting "no," and his failure to instruct the jury that it was their duty to answer said questions and not return divided answers, which resulted in the jury returning a divided answer to one of three special questions submitted to them, *held*, reversible error, since the special findings control the general verdict.

Error to Berrien; White (Charles E.), J. Submitted January 9, 1920. (Docket No. 47.) Decided April 10, 1920.

Case by Adolph Tober against the Pere Marquette Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Parker, Shields & Merriam* (*Gore & Harvey,* of counsel), for appellant.

*Cady & Andrews* and *Thomas J. Cavanaugh,* for appellee.

STEERE, J.    Plaintiff Tober, a section hand in defendant's employ, was struck and seriously injured by a switch engine in defendant's yards at Benton Harbor while he was working on the track clearing snow from a switch, between 10 and 11 o'clock in the evening of December 9, 1917. It was a cold, stormy night with strong winds drifting the snow. As was customary when a storm was on and such conditions required it, section men, or track hands, were called out to clear the switches of ice or drifted snow which impeded their operation. Tober worked that evening with a fellow member of the section crew named Henn. When working on the tracks or at the switches the men for greater safety against being caught by a passing train or engine faced in opposite directions. At the time of the accident the two men were working with shovels clearing a switch in the south portion of the yard on the north-bound main track. As it was a cold, stormy night with strong gusts of wind driving and filling the air with snow, these men had their caps pulled down over their heads and high coat collars turned up. They were working on the track at the switch 7 or 8 feet apart, with Tober facing southerly along the track and Henn northerly, when a switch engine, returning from helping a heavy freight train on the north-bound track out of the yard and over a grade about a mile and a half away, came from the north on the north-bound main track unobserved

by either of them until just upon them. Henn first saw it "a car length—maybe two," away, saying:

"and so I went that same second and hollered to him and I jumped over to the south side. * * * I jumped and hollered to Tober, * * * 'Look out, Tober, my G—d, look out,' I said that same second."

Henn escaped injury, but Tober, who immediately jumped on receiving the warning, was struck by the engine and thrown some distance to one side of the track, receiving serious injuries. None of the switching crew saw these men working on the track or knew plaintiff had been struck until later informed by the yard conductor, although they claimed not to have been running over six miles an hour and were watching ahead as far as possible under existing conditions. The switch engine backed when pushing at the rear of the freight train in helping it out of the yard and over the grade to the north, and when returning on the north-bound track was headed south. The conductor testified that "it was a terrible blizzard" and most of the time it was impossible to see any dark object at all, but the headlight would occasionally give a glimpse of the track a short distance ahead, and he kept his head out of the side cab window on the lookout all the time, as the front cab window was covered with ice. When the freight train moved out of the yard at 10:10 with the switch engine assisting it Tober and Henn were working on switches in the north part of the yard and Tober saw it go out. They were later sent down to clear switches toward the other end of the yard and had been there but a short time when the switch engine, which returned at 10:45, came upon them. The testimony of the parties was in conflict as to the speed at which the switch engine ran, the distance plaintiff was thrown by it, whether it was properly lighted or not, and whether signals of its approach were given by bell or whistle.

Plaintiff brought this action in the circuit court of Berrien county under the Federal liability act of April 22, 1908 (35 U. S. Stat. 65, chap. 149), which with the Federal decisions in relation to it control. His declaration charges that defendant's

"negligence consisted in running the said engine at an excessive rate of speed, and in failing to cause the whistle to be blown or the bell to be rung as the engine approached the place where plaintiff was engaged in his work, and failed to cause the whistle to be blown or the bell to be rung as the engine approached the public highway crossing immediately northerly of the Benton Harbor passenger depot, the crossing being near the point where said plaintiff was working, and said negligence consisted in the failure of the defendant to give, or cause to be given, to plaintiff any notice of the approach of said engine."

Plaintiff had verdict and judgment thereon for $6,-000. Motion for a new trial was denied and defendant seeks review and reversal on various grounds under numerous assignments of error, contending that a verdict should have been directed in its favor because no actionable negligence was shown; that the verdict was excessive and contrary to the great weight of evidence; that the court erred in instructing the jury as to the duty of defendant and the measure of damages under the Federal law; and that they need not agree upon the special questions propounded to them; because of improper and prejudicial language of plaintiff's counsel in closing argument to the jury, and in other particulars which need not be detailed.

We are not prepared to hold upon this record, as a conclusion of law, that there was no testimony in the case which would permit the court to submit to the jury the question of defendant's negligence under the indicated abnormal conditions prevailing there that evening, but it could only be predicated upon neglect of some secondary duty defendant owed plaintiff upon

whom primarily rested the duty of self-preservation in the line of his employment, by keeping a lookout for and avoiding moving cars and engines which might pass upon the track at which he was at work. His duty in the line of his employment to look out for and avoid trains or engines upon the tracks where he worked is not to be measured by the obligation to exercise care imposed upon passengers upon trains or travelers on highways. We are impressed the court did not fairly instruct the jury as to plaintiff's responsibility in that particular and placed a heavier burden upon defendant than the law imposes. It is stated as a general rule in 3 Elliott on Railroads (2d Ed.), § 1258:

"Even as to employees, the company is under no obligation to ring the bell or sound the whistle upon a switching engine engaged in making up trains in its yard, for the purpose of notifying such employees, who are familiar with the operation of the yard."

To this proposition the author cites *Aerkfetz* v. *Humphreys*, 145 U. S. 418 (12 Sup. Ct. Rep. 835), which this court cited and quoted from with approval in *Carlson* v. *Railroad Co.*, 120 Mich. 481, followed by *Burrman* v. *Railway Co.*, 143 Mich. 689, and *Barnhart* v. *Railroad Co.*, 188 Mich. 537. In *Morris* v. *Railroad*, 184 Mass. 368 (68 N. E. 680), the rule is thus concisely stated, with citation of numerous authorities:

"By the nature of his employment a section hand upon a steam railroad must look out for passing trains, and such is the settled law of the commonwealth."

In *Connelley* v. *Railroad Co.*, 119 C. C. A. 392, 201 Fed. 54 (47 L. R. A. [N. S.] 867), the reason of the rule is discussed at some length, it being said amongst other things:

"It is obvious that even where a railroad operates its trains, and moves its switch drafts in a proper

and careful manner, trackwalkers and repairmen are necessarily subjected to great risks. Their very occupation is one of constant peril. Indeed, it follows from the nature of such employment that the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them. And such has been the reasonable holding of the law. * * * Indeed, in thus making self-protection the substantial safeguard of trackwalkers and sectionmen, the law is reasonable and just, for no other dependable safeguard can be afforded their perilous work in the practical operation of railroads. * * * This rule has the uniform support of courts in all sections of the country." Citing numerous decisions.

It was claimed and denied that the whistle was sounded by the returning switch engine at a street crossing several hundred feet north of the place of the accident, and the court correctly instructed the jury that a failure to give the statutory signals which were for protection of the public, and not the company's employees, would not, in itself, entitle plaintiff to recover, but also said:

"It was its duty to give plaintiff a reasonable warning of the approach of its engine by blowing the whistle, sounding the bell, or otherwise, and to operate the engine at a reasonable rate of speed, and to have it under reasonable control, having in mind the place where the accident occurred, and the nature of the wind and the storm, the darkness of the night, and the ability of those who were operating the engine to see other employees of the defendant who might be lawfully employed upon defendant's track.

"If, under these circumstances, you find that no warning was given plaintiff of the approach of the engine by reasonably sounding the bell, blowing the whistle or otherwise, then I charge you that the defendant was guilty of negligence, and if such negligence was the proximate cause of plaintiff being struck by the engine and the injuries he received thereby, then the plaintiff is entitled to recover in this case. * * *

"I charge you that before you can find a verdict against the defendant, you must find that the defendant neglected some one or more of the duties which are alleged in the declaration, and that such neglect was the proximate cause of the plaintiff's injury."

Failure to ring the bell and blow the whistle as the engine approached a crossing some hundreds of feet north of where plaintiff was working is specifically alleged as negligence in the declaration. Under the Federal law the rule of comparative negligence was involved in this case. We think the charge failed to fairly advise the jury as to plaintiff's primary duty of self-protection in his special employment and the comparative responsibility of the parties, which it may well be contended was reflected in the verdict.

Although it was primarily plaintiff's duty when working upon the tracks to look out for his own safety and keep out of the way of passing engines or trains, and the duty imposed upon defendant in its switching operations with reference to yard employees or section hands working upon the track was much less in degree than as to others, there was yet a concurrent or secondary duty to carry on the yard work with reasonable speed, caution and care for the safety of all employees at work in the yard, according to existing conditions. That weather conditions were unusual, is undisputed. It was shown by defendant's witnesses that there were 25 switches in the yard which it was necessary to keep clean, that in the yard it was customary for the engine to move at a slow rate, that the bell and headlights are important in such work, that it was the custom to ring the bell, that it was not rung that evening when the switch engine was pushing behind the freight train it had made up as it went out of the yard and over the grade. It was also testified by the switch crew that it was ringing when they returned from the trip, and denied by plaintiff

that it was ringing as it approached where he was struck. Three special questions were submitted to the jury as follows:

"(1) Was the engine bell ringing just before and at the time of the collision?
"(2) Was the headlight on the engine burning?
·"(3) Was the speed of the locomotive less than eight miles an hour?"

After having retired to consider of their verdict the jury returned into court and asked for instruction in regard to answering these special questions, among other things desiring to be informed if they should specify how each one voted, and the following took place:

"*The Court:* You just answer those questions 'yes' or 'no' and sign your names. If there is a difference of opinion that makes a different question. * * *

"*A Juror:* If we did not agree on all three questions?

"*The Court:* The way they are drawn there, if you are not agreed, I suppose you could show the fact, 'yes' so many votes and 'no' so many votes. That would show the fact. That is not supposed to show how each member voted at all. * * *

"*A Juror:* We don't have to be unanimous?

"*The Court:* Whatever way the facts are, you vote as you think the facts justify on that question. For instance, if you all vote 'yes' on one question, you simply answer to that question 'yes.' If you all vote 'no,' you mark it 'no.' And if to a certain question a certain number vote 'yes' and a certain number vote 'no,' you will so indicate on the question. * * *

"*A Juror:* ˙Not agreed?

"*The Court:* I should say so many 'yes' and so many 'no.'

"*A Juror:* That has nothing to do with the verdict we bring in either way?

"*The Court:* That is a question of law, and I won't answer that."

When the jury reported an agreement and rendered

their general verdict they returned the special questions with written answers in harmony with the court's suggestion of how they might do so.

No. 1, relative to whether the bell was ringing, was answered by four jurors voting "yes" and eight voting "no." No. 2, by 12 voting "yes," and No. 3 by 12 voting "no."

Section 12611, 3 Comp. Laws 1915, provides:

"When any special finding of fact shall be inconsistent with the general verdict the former shall control the latter and the court give judgment accordingly."

A failure of the jury to answer a question containing an affirmative fact essential to and of some controlling force in reaching a verdict has been held to result in a mistrial. *Harbaugh* v. *Cicott*, 33 Mich. 241; *Cole* v. *Boyd*, 47 Mich. 98; *Wilson* v. *Railroad Co.*, 57 Mich. 155.

In *Cole* v. *Boyd*, *supra*, it was said of special questions that—

"In conformity with well settled principles the special findings in all cases control the general verdict. Their purpose is to enable the court to know what view the jury take in the material issues, and to correct their possible wrong inferences from the facts which they find to exist."

The court should have instructed the jury it was their duty to answer the special questions, without permission to return divided answers or suggestion as to reporting how they stood if unable to agree and thus avoid a direct decision. *Crane* v. *Reeder*, 25 Mich. 303.

For the foregoing reasons the judgment must be and hereby is reversed, with costs to defendant, and a new trial granted.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.